**LIVERMORE AMADOR VALLEY WASTEWATER MANAGEMENT AGENCY (LAVWMA), a joint powers agency, Plaintiff,**

v.

**NORTHWEST PIPE & CASING COMPANY, an Oregon Corporation, L.B. Foster Company, a corporation, and Does 1 through 50, Defendants.**

**No. C–94–3431 EFL.**

United States District Court, N.D. California.

Sept. 11, 1995.

Tieala Chalmers, Farella, Braun & Martel, San Francisco, CA, for plaintiff.

Gref Harris, Ater, Wynne, Hewitt, Dodson & Skerritt, Richard M. Kaplan, Richard D. Rosenberg, Goldstein & Phillips, San Francisco, CA, for defendants.

### ORDER

LYNCH, District Judge.

## I.  INTRODUCTION

Plaintiff is a joint power agency responsible for managing the wastewater for several East Bay cities and areas. Between 1978 and 1979, plaintiff designed and had constructed a wastewater export pipeline. The pipeline was constructed according to bid and contract documents, including a Request for Proposals drafted by plaintiff. These documents established detailed specifications for the pipeline. The coal tar enamel lined pipe used in the construction of the portion of the pipeline at issue here was manufactured by Beall, the predecessor in interest to defendant Northwest Pipe & Casing Company ("Northwest") and was supplied by defendant L.B. Foster Co. ("Foster"). The pipeline contractor, S.J. Groves and Sons ("Groves") is not a party.

While making unrelated repairs to the pipeline, plaintiff discovered that the coal tar enamel lining was detached from portions of the pipeline. Plaintiff has sued, alleging two causes of action: a claim for negligence, and a claim for products liability. In an Order dated November 18, 1994, the Court denied the defendants' motion to dismiss. Both defendants have now moved for summary judgment on both claims. Oral argument was held on June 14, 1995, with all parties represented by counsel. For the reasons set forth below, the Court GRANTS both defendants' motions for summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue exists as to any material fact and where the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of establishing that there is no genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

After the moving party makes a properly supported motion, the non-moving party has the burden of presenting specific facts showing that contradiction is possible. *British Airways Board v. Boeing Co.*, 585 F.2d 946, 950–52 (9th Cir.1978). It is not enough for the non-moving party to point to the mere allegations or denials contained in the pleadings. Instead, it must set forth, by affidavit or other admissible evidence, specific facts demonstrating the existence of an actual issue for trial. The evidence must be more than a mere "scintilla" of evidence; the non-moving party must show that the trier of fact could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Summary judgment may be granted "[i]f the evidence is merely colorable . . . or is not significantly probative." *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir.1987). In reviewing a motion for summary judgment, the Court must take the non-movant's evidence as true and all inferences are to be drawn in the light most favorable to the non-movant. *Id.* at 1289. It is with this standard in mind that the Court reviews both defendants' motions for summary judgment.

## III. DISCUSSION

### A. *Plaintiff's Complaint*

Plaintiff alleges that the contract governing the downhill portion of the pipeline, which is the portion at issue here, "called for the pipe to be coated with coal tar enamel, to a particular thickness." Complaint at ¶ 11. "One purpose of the lining is to protect the pipe from corrosion and, ultimately, leakage." *Id.* In 1992, plaintiff discovered that one-third of the lining in the downhill portion of the pipeline was missing from the pipe interior. *Id.* at ¶¶ 12, 14. This delamination of the pipe has resulted in corrosion of the pipe. *Id.* at ¶ 15. This corrosion, in turn, has exposed the pipe to the risk of leakage. *Id.* at ¶ 27. Plaintiff alleges that the delamination resulted from the improper application of the enamel coating to the pipe. *Id.* at ¶ 15. Plaintiff contends that "the entire downhill portion of the pipeline must be repaired or replaced in order to avoid complete corrosion and leakage." *Id.* at ¶ 27. The complaint seeks between $10 million and $30 million in damages for "the cost of repairing and/or replacing the pipe in question" as well as for the costs of constructing an alternative pipeline to be used while repairs are underway. *Id.* at ¶ 29.

Plaintiff alleges two causes of action. In the first cause of action, captioned "Negligence," plaintiff alleges that the pipe was negligently manufactured and supplied "in that the coating failed to adhere properly to the pipe, and could not and did not withstand the wastewater load for which it was designed." Complaint at ¶ 20. Plaintiff further alleges that the pipe was specifically manufactured and specifically supplied for its pipeline project, *id.* at ¶¶ 21–22, and that both defendants were aware of the intended use of the pipe, the purpose of the lining, and the consequences that would result if the lining did not properly adhere to the pipe. *Id.* at ¶¶ 21–23, 25.

Plaintiff's second cause of action is titled "Products Liability" and states a claim for strict liability. In this claim, plaintiff alleges that the coating on the pipe "was defective in that the coating failed to adhere properly to the pipe, and became detached." Complaint at ¶ 36. Plaintiff alleges that "[a]s a proximate result of the defective coating, the pipe is damaged in that it became, and is becoming, corroded, and that corrosion will, if not repaired, result in leakage of sewage and consequent personal injury and property damage." *Id.* at ¶ 37. Plaintiff again alleges damages in the amount of between $10 million and $30 million for the repair and/or replacement of the pipe. *Id.* at ¶ 39.

Both defendants move for summary judgment on both causes of action. Defendants contend that because plaintiff is seeking purely economic damages, and because purely economic damages are not available for either negligence or strict liability claims, defendants are entitled to judgment in their favor. Plaintiff contends first that it has alleged property damage, and not purely economic damages, and secondly that even if it had alleged purely economic damages, such damages are available in this case.

### B. *Economic Damages*

■ The first issue facing the Court is whether plaintiff has alleged more than purely economic damages. California law distinguishes between physical damage to property, and damage that consists solely of economic damages.[1] *See, e.g., Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965); *Sacramento Regional Transit Dist. v. Grumman Flxible,* 158 Cal. App.3d 289, 204 Cal.Rptr. 736 (1984). While "not always easy to draw," *Huang v. Garner,* 157 Cal.App.3d 404, 420, 203 Cal.Rptr. 800 (1984), "the line between physical injury to property and economic loss reflects the line of demarcation between tort theory and contract theory." *Sacramento Regional Transit,* 158 Cal.App.3d at 294, 204 Cal.Rptr. 736. Economic damages are defined as "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property...." *Id.* Purely economic damages result when a plaintiff fails "to allege physical injury to its property apart from the man-

---

1. California law applies in this diversity action.

ifestation of the defect itself." *Id.,* at 294. In contrast, strict liability for property damage "presupposes (1) a defect and (2) *further* damage to plaintiff's property caused by the defect." *Id.* (Emphasis in original.)

The case at bar is similar to *Sacramento Regional Transit,* 158 Cal.App.3d 289, 204 Cal.Rptr. 736. In *Sacramento Regional Transit,* plaintiff purchased a fleet of busses from defendant. When plaintiff discovered that a number of busses had cracked fuel tank supports, it sued for damages based on negligence and strict liability. In affirming the trial court's order sustaining a demurrer, the appellate court held that "plaintiff failed to allege physical injury to its property apart from the manifestation of the defect itself." *Id.,* 158 Cal.App.3d at 294, 204 Cal.Rptr. 736. The court held that "[w]hen the defect and the damage are one and the same, the defect may not be considered to have caused physical injury." *Id.* at 294, 204 Cal.Rptr. 736. Because the only damage plaintiff suffered was the cost of repair, it sustained "purely economic damages." *Id.* See also, *Anthony v. Kelsey–Hayes Co.,* 25 Cal.App.3d 442, 446–47, 102 Cal.Rptr. 113 (1972) (Because no personal injury or property damage resulted from a defective wheel which had the potential to break apart, but which had not done so, plaintiffs suffered only a loss of its bargain, and therefore suffered only economic damages.)

■ Similarly, plaintiff LAVWMA has, to date, suffered only economic loss. Plaintiff has not alleged that the pipe has burst, or has caused any property damage or personal injury. Instead, plaintiff alleges that the pipe itself is delaminated and corroded, and will need to be either replaced or repaired. The damage and the defect are one and the same: delaminated, corroded pipe.

Plaintiff's opposition to the motions for summary judgment states that plaintiff is not seeking the cost of repair, but that it is instead alleging "actual physical corrosion and pitting of the metal pipe as a result of the defective enamel lining." Plaintiff's Opp. at 5. In opposition to the motion for summary judgment, plaintiff characterizes the pipeline as consisting of two products: the metal pipe, and the coal tar enamel lining.[2] Plaintiff argues that when the defect in one portion of the product caused damage to another portion of the product, its losses are not barred by the economic damages rule, citing *Gherna v. Ford Motor Co.,* 246 Cal. App.2d 639, 55 Cal.Rptr. 94 (1966), and *International Knights of Wine, Inc. v. Ball Corp.,* 110 Cal.App.3d 1001, 168 Cal.Rptr. 301 (1980). Plaintiff contends that the defect in the coal tar lining has caused the pitting and corrosion of the metal pipe, and that plaintiff is therefore not precluded from recovering its damages by the economic damages rule.

The Court finds that neither case applies here. In *International Knights of Wine,* 110 Cal.App.3d 1001, 168 Cal.Rptr. 301, plaintiff purchased bottles of wine which were damaged when metal caps sealing the bottles corroded and damaged the wine. There, the damage was to the wine, a product separate and apart from the defective caps. In *Gherna,* 246 Cal.App.2d 639, 55 Cal.Rptr. 94, a fire in an automobile engine resulted from an unknown cause. The court reversed a nonsuit as to strict liability, finding that there was conflicting evidence on how the plaintiff had used the car. *Id.* at 650, 55 Cal.Rptr. 94. The *Gherna* court did not address or decide whether defective wiring or transmission fluid, which may have caused the fire, were separate products from the car.

But regardless of the holding of these cases, neither assists plaintiff here. The complaint alleges "that the pipeline was delaminated and corroded, and exposed to the risk of leakage." Complaint at ¶ 27. *Id.* at ¶ 37. Thus, the coal tar enamel lined pipe at issue here is one product: coal tar enamel lined pipe, as is clear from plaintiff's complaint, and not, as plaintiff now alleges without any supporting evidence, two products consisting of coal tar enamel lining and pipe. The fact that the pipe may have both a metal component and a lining component does not mean that it is two separate products. For instance, the United States Supreme Court addressed whether a shipbuilder could recover in strict liability from a manufacture who designed turbines when the turbines were

---

**2.** Plaintiff has supplied no evidence in support of this characterization.

defectively designed and manufactured. *East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In holding that strict liability did not apply, the Court in that case looked to whether the shipbuilder had alleged property damage or economic damage when it alleged the turbines were defectively designed and manufactured. The Court held:

> In the traditional "property damage" cases, the defective product damages other property. In this case, there was no damage to "other" property. Rather, ... each supertanker's defectively designed turbine components damaged only the turbine itself. Since each turbine was supplied by Delaval as an integrated package, each is properly regarded as a single unit. "Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability."

*Id.* at 867, 106 S.Ct. at 2300. (Citations omitted.)

Here, defendant Northwest has manufactured and defendant Foster has supplied a single product of coal tar enamel lined pipe. Plaintiff has alleged that the defectively lined pipe has damaged the pipe. The defect has not damaged any separate property, such as a valve or other component of the pipeline, nor has it injured real property, nor has it destroyed or harmed personal property outside of the pipe itself. Instead, the damage and the defect are the same.

■ This conclusion is bolstered by the damages sought by plaintiff. The complaint alleges that "the pipe is damaged in that it became, and is becoming, corroded, and that corrosion will, if not repaired, result in leakage of sewage and consequent personal injury and property damage." Complaint at ¶ 37. The complaint further alleges that "the

costs of repairing and/or replacing" the pipe is between $10 million and $30 million. *Id.* at ¶¶ 29, 39. First, the costs of repair and replacement are traditionally considered to be economic damages. *Sacramento Regional Transit,* 158 Cal.App.3d at 294, 204 Cal. Rptr. 736. Second, plaintiff's Prayer for Relief seeks as compensatory damages $30 million, precisely the upper boundary of its estimated cost of repair and/or replacement. Thus, the complaint has alleged damage to the pipe itself and seeks economic damages for the cost of repair or replacement.

Accordingly, the Court finds that plaintiff has alleged only economic damage and not property damage. The Court next turns to the question of whether purely economic damages are available to plaintiff.

### C. *Economic Damages for Strict Liability*

The parties agree that in California, "purely economic damages" are not recoverable in strict liability. *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). *See* Plaintiff's Opp. at 3. In *Seely,* the California Supreme Court held that a manufacturer is generally not liable for commercial losses due to a defective property under a theory of strict liability. The *Seely* court reasoned that the doctrine of strict liability in tort was designed to govern the distinct problem of physical injuries, not to undermine the warranty provisions of the Uniform Commercial Code ("UCC"). *Id.* at 15, 45 Cal.Rptr. 17, 403 P.2d 145. In *Seely,* the court held that damages arising out of plaintiff's inability to use a malfunctioning truck for his business were not recoverable in tort, but could only be recovered under an express warranty theory. *Id.*

■ Here, because plaintiff has alleged only economic damages, summary judgment on plaintiff's claim for strict liability must be granted in favor of defendants in accordance with the longstanding *Seely* rule.[3]

---

**3.** The Court notes that even if plaintiff had alleged more than economic damages, strict liability is barred here under California law. Strict liability is not available to contracting parties who deal in a commercial setting. *Kaiser Steel*

*Corp. v. Westinghouse Electric Corp.,* 55 Cal. App.3d 737, 127 Cal.Rptr. 838 (1976).

> The doctrine of strict liability does not apply as between parties who: (1) deal in a commercial setting; (2) from positions of relatively equal economic strength; (3) bargain the specifica-

## D. *Economic Damages for Negligence*

In addition to arguing that plaintiff is not entitled to economic damages in its strict liability claim, defendants contend that no action in negligence lies when plaintiff claims purely economic damages. In support of this argument, defendants rely on dicta in *Seely* regarding the unavailability of economic damages in a negligence suit. *Seely*, 63 Cal.2d at 18, 45 Cal.Rptr. 17, 403 P.2d 145. Plaintiffs, on the other hand, argue that California law permits recovery for purely economic damages in negligence cases, citing *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979).

As will be explained in more detail below, the Court finds that the law in California is "not entirely clear as to the viability of a claim in negligence, for economic damages, between commercial entities." *Frank M. Booth, Inc. v. Reynolds Metals Co.*, 754 F.Supp. 1441, 1450 (E.D.Cal.1991). Thus, the task before this Court is to "predict what the state supreme court would decide." *United States v. Mendoza–Acuna*, 764 F.2d 699, 701 (9th Cir.1985); *Amfac Mortg. Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 434–35 (9th Cir.1978). In the absence of clear authority, the Court looks for guidance from decisions of the state appellate courts and courts in other jurisdictions. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir.1986).

In *Seely*, the California Supreme Court held that purely economic damages are unavailable in strict liability. *Seely*, 63 Cal.2d at 15, 45 Cal.Rptr. 17, 403 P.2d 145. In dicta, the *Seely* court noted "[e]ven in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." *Id.* at 18, 45 Cal.Rptr. 17, 403 P.2d 145. A number of courts applying California law have followed *Seely* in barring recovery of purely economic damages in negligence cases. For instance, an appellate court affirmed the dismissal of plaintiff's negligence claim when plaintiff's damages were economic damages resulting from the cost of repairing defective trucks. *Sacramento Regional Transit*, 158 Cal.App.3d at 294, 204 Cal.Rptr. 736. *See also, Anthony v. Kelsey–Hayes*, 25 Cal.App.3d at 447, 102 Cal.Rptr. 113 ("In actions bottomed on negligence, there is no recovery against a manufacturer for economic loss alone."); *S.M. Wilson & Co. v. Smith Intern., Inc.*, 587 F.2d 1363, 1376 (9th Cir. 1978) (affirming dismissal of negligence counts and limiting parties' rights to those provided in the UCC.); *Frank M. Booth*, 754 F.Supp. 1441, 1449 (E.D.Cal.1991) (dismissing negligence claim when only economic damages were alleged).

The *Seely* Court's reasoning has also been adopted by the United States Supreme Court in the admiralty context. *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In *East River*, the Court held "we adopt an approach similar to *Seely* and hold that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* at 871, 106 S.Ct. at 2302.

The cases adopting the bar on negligence claims for purely economic damages do so on the theory that "[w]hen a product injures only itself the reasons for imposing a tort

---

tions of the products; and (4) negotiate concerning the risk of loss from defects in it. *Id.* at 748, 127 Cal.Rptr. 838. *See also, e.g., Scandinavian Airlines System v. United Aircraft Corp.*, 601 F.2d 425 (9th Cir.1979). The parties agree that the first three factors identified in *Kaiser Steel* are present here, but dispute whether the fourth has been met. Plaintiff contends that because the parties did not *actually* negotiate about the risk of loss, strict liability applies. However, "ability to negotiate respecting risk of loss from a defective product" satisfies the fourth *Kaiser Steel* requirement. *International Knights of Wine*, 110 Cal.App.3d at 1007, 168 Cal.Rptr. 301. "It should be necessary only to show that the party seeking to invoke the doctrine *could have* negotiated so as to remove himself from the risk of loss from defective products." *Id.* at 1007 n. 1, 168 Cal.Rptr. 301. Here, because plaintiff drafted the Request for Proposals, it, and not defendants, was the master of the contract. Plaintiff could have demanded a warranty but did not. Plaintiff's failure to negotiate when it was in a position to should not result in strict liability. Moreover, the fact that the parties were not in privity does not mean that the parties could not have negotiated the risk of loss, since plaintiff could have required warranties from its suppliers through its general contractors in this public-bid contract.

duty are weak and those for leaving the party to its contractual remedies are strong." *East River*, 476 U.S. at 871, 106 S.Ct. at 2302. Tort concerns come into play when safety is an issue; this concern with safety "is reduced when an injury is only to the product itself." *Id.* When a product injures only itself, only commercial losses ensue. As a matter of policy, the commercial user can insure itself, or can contract around the risk of economic loss. *Id.* at 872, 106 S.Ct. at 2302–03. The Supreme Court noted "[c]ontract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements." *Id.* at 872–73, 106 S.Ct. at 2302–03. *See also, Kaiser Steel*, 55 Cal.App.3d at 747, 127 Cal.Rptr. 838. As noted in *Sacramento Regional Transit*, the bar on negligence claims "is necessary so that the Uniform Commercial Code, governing commercial transactions, is not completely subsumed by the law of tort." *Sacramento Regional Transit*, 158 Cal.App.3d at 298, 204 Cal.Rptr. 736. If tort law were to subsume the UCC, uncertainty would be introduced "into areas of commercial dealing in which the UCC has striven for predictability and to preserve the bargain of the commercial parties." *Frank M. Booth*, 754 F.Supp. at 1449.

Plaintiff argues, however, that *Seely* does not apply and that the Court should instead follow *J'Aire, supra,* and cases which have applied it. Plaintiff contends that *J'Aire* provides that economic damages are recoverable in negligence cases. Defendants disagree, and the Court finds that defendants are correct.

In *J'Aire*, a building owner hired a contractor to perform work on the heating and air-conditioning systems. The tenant, a restaurant, was unable to operate during the construction. The tenant sued the contractor, alleging that it had lost profits due to the length of time the restaurant was closed. The *J'Aire* court held that there was a "special relationship" between the plaintiff and the defendant, such that the defendant owed the plaintiff a duty of care even though plaintiff was not a party to the contract between the defendant and the building own-

er. *J'Aire*, 24 Cal.3d at 805, 157 Cal.Rptr. 407, 598 P.2d 60. The court further held that plaintiff had stated a cause of action for negligent interference with prospective economic advantage, and could seek to recover lost profits. *Id.* In an extension of *J'Aire*, a California Court of Appeal held that a plaintiff could state a cause of action for negligence when a plaintiff purchased cans from a can supplier and the can supplier delivered the wrong type of cans, even though the plaintiff suffered only economic losses. *Ales–Peratis Foods Internat., Inc. v. American Can Company*, 164 Cal.App.3d 277, 209 Cal.Rptr. 917 (1985). Plaintiff argues that this Court should follow *Ales–Peratis* in its extension of *J'Aire* from the services realm to the realm of manufactured products.

The Court's task here is to predict whether the California Supreme Court would allow plaintiff to state a claim for purely economic damages in this case. *Amfac Mortg.*, 583 F.2d at 434–35. The Court finds that it would not. First, the Court finds that *J'Aire* does not apply. *J'Aire* simply held that a plaintiff can state a claim for negligent interference with prospective economic damages in a construction contract when certain conditions are met. Because the plaintiff in *J'Aire* was not in privity of contract with the defendant, plaintiff had no other remedy in contract or under the UCC or the California Commercial Code. However, *J'Aire* did not overrule, distinguish, or even address the well-settled principles discussed in *Seely*. *J'Aire* was not a sale of goods case, nor were the parties in *J'Aire* regulated by the UCC. Thus, *J'Aire* did not hold that a plaintiff could state a claim for negligence when a plaintiff has suffered only economic damages in a sale of goods situation or in a case in which the UCC governed. *See, e.g., Frank M. Booth*, 754 F.Supp. at 1449 (holding *J'Aire* did not apply in a sale of goods case). While plaintiff is correct that *J'Aire* is still the law in California, the Court finds that the rule in *J'Aire* simply does not apply in the sale of goods context. Further, the Court finds that the California Supreme Court would not follow the *Ales–Peratis* "extension" of *J'Aire* to a sale of goods context in light of the strong public policy reasons for protecting commercial relationships from the

instability of tort claims when the parties are in a position to bargain over any risk of loss. *Frank M. Booth,* 754 F.Supp. at 1450.

The Court finds that a plaintiff alleging purely economic damages cannot maintain a claim for negligence under California law. Therefore, the motions of both defendants for summary judgment on plaintiff's claim for negligence must be granted.

## IV. CONCLUSION

For the foregoing reasons and for good cause shown, the motions of defendant Foster and defendant Northwest for summary judgment are GRANTED. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.